IN THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF UTAH

CENTRAL DIVISION

| | |
|---|---|
| KOCH INDUSTRIES, INC.,<br><br>     Plaintiff,<br><br>vs.<br><br>JOHN DOES, 1-25,<br><br>     Defendants. | MEMORANDUM DECISION<br>AND ORDER<br><br>Case No. 2:10CV1275DAK<br><br>Judge Dale A. Kimball |

This matter is before the court on Defendants' Motion to Quash Subpoenas, Issue Protective Order, and Dismiss Complaint. The court held a hearing on the motions on April 28, 2011. At the hearing, Plaintiff was represented by Juliette P. White and Judith Powell, and Defendants were represented by Deepak Gupta and Lester A. Perry. The court took the motion under advisement. The court has carefully considered the pleadings, memoranda, and other materials submitted by the parties, as well as the law and facts relating to these motions. Now being fully advised, the court renders the following Memorandum Decision and Order.

## BACKGROUND

Koch Industries is a Kansas corporation that owns multiple companies involved in a wide variety of industries, including oil, coal, chemicals, fibers, pollution control equipment, forest and consumer products, and commodity trading. Koch describes itself as "one of the largest private companies in the world." Koch owns a number of federal trademark registrations for the Koch name and mark.

As part of the promotion of Koch's business, Koch maintains a website under the domain name kochind.com. In addition to describing its many companies, Koch's website expresses Koch's policy viewpoints on several political issues. The website also includes periodic editorials taking issue with such things as the conclusions of scientists regarding climate change and the Obama administration's environmental policies. Furthermore, Koch uses its website to respond to critics of its political viewpoints. Because of the nature of Koch's businesses, the website provides only information and there are no products for sale on the website.

During the course of this litigation, Defendants identified themselves as anonymous members of Youth for Climate Truth, a group concerned about global climate change. This case arises from a press release created by Defendants purporting to announce a decision by Koch Industries to stop funding organizations that deny climate change. The press release was emailed to various new organizations and included a link to a website created by Defendants, [www.koch-inc.com.](www.koch-inc.com) Defendants' website had the same look as the actual Koch Industries site but included the fake press release. Defendants' website also contained a link to the actual Koch website.

Defendants' press release announced that Koch would "restructure its support for organizations that undertake climate change research and advocacy." The release claimed that the company would withdraw funding from groups "whose positions on climate change could jeopardize America's continued global competitiveness in the energy and chemical sectors." Such sentiments were in stark contrast to the policy viewpoints usually expressed by Koch. The press release and website were designed to appear as though they were created by Koch and did not mention the name of Youth for Climate Truth or any of its members.

Defendants' fake website at [www.koch-inc.com](www.koch-inc.com) was up for a few hours. Despite its brief

existence, however, the press release and website drew a fair amount of media attention. The New York Times and The Hill quickly wrote articles identifying the press release and website as hoaxes. The Economist and other publications also wrote articles identifying the press release and website as spoofs. There is no evidence that any media organization was fooled by Defendants' actions. Koch Industries, however, states that it was required to spend time and money responding to numerous inquiries and investigating Defendants' conduct.

Because of the fake press release and website, Koch Industries brought the instant lawsuit asserting causes of action for federal trademark infringement, violation of the Anticybersquatting Consumer Protection Act, federal unfair competition, violation of the Computer Fraud and Abuse Act, common law trademark infringement and unfair competition, and breach of the terms and conditions of Koch Industries' website.

After filing the Complaint, Koch filed an *ex parte* motion for accelerated pre-conference discovery to seek the identity of the anonymous Defendants. Koch sought to serve subpoenas on Fast Domain, the domain registration company Defendants used to register the domain name koch-inc.com, and BlueHost.com, the web-hosting company Defendants used to set up the fake website. This court granted Koch's motion and the subpoenas were served.

Because of the media's coverage of the court's order allowing the issuance of subpoenas to uncover the identity of the anonymous Defendants, Defendants learned of the lawsuit and filed the present motion. In filing the motion, Defendants disclosed the name of the group behind the fake press release and website. Defendants, however, seek to keep the names of the individuals involved anonymous. Although the web companies complied with the subpoenas, the identities of individuals who may have been disclosed through such compliance have not been disclosed

publicly or to the court.

## DISCUSSION

**Defendants' Motion to Quash Subpoenas, Issue Protective Order, and Dismiss Complaint**

Defendants' motion seeks two forms of relief: the protection of Defendants' identities and the dismissal of Koch's Complaint. These two requests are governed by differing standards. Defendants' motion to dismiss is subject to the standard requirements for evaluating a motion to dismiss. Defendants' request to quash the subpoenas and protect individual identities from disclosure is subject to a separate standard applied in cases involving First Amendment concerns. The parties fundamentally disagree as to whether Defendants' conduct is political speech protected by the First Amendment or unprotected commercial speech. Because Defendants' motion to dismiss raises the issue of whether Defendants' conduct constitutes commercial speech and can potentially be dispositive of the discovery motion, the court will analyze the motion to dismiss first.

**A. Motion to Dismiss**

Defendants argue that Koch's Complaint fails to state a claim upon which relief can be granted and the court should dismiss this action. Koch, however, claims that it has established a prima facie case against Defendants on each of its causes of action. Koch's Complaint asserts causes of action that can be addressed in three main groups: (1) federal and common law trademark infringement and unfair competition; (2) violation of the Anticybersquatting Consumer Protection Act ("ACPA"); and (3) violation of the Computer Fraud and Abuse Act ("CFAA") and breach of contract.

**1. Trademark Infringement and Unfair Competition (Counts I, III, and V)**

Defendants argue that Koch's first, third, and fifth claims alleging trademark infringement and unfair competition under state and federal law should be dismissed because there was no commercial use of the trademark; rather, the trademark was solely used to make a political statement. Koch asserts, however, that its Complaint pleads a prima facie case of trademark infringement and its claim should not be dismissed because it does not know the full extent of Defendants' unauthorized use of Koch's marks at this stage of the litigation. Koch's Complaint alleges that Defendants issued the press release and set up the false website "to deceive and confuse the public, to disrupt and harm Koch's business and reputation, and to draw attention to and funding for Defendants' activities."

"The Lanham Act is constitutional because it only regulates commercial speech, which is entitled to reduced protections under the First Amendment." *Taubman v. Webfeats*, 319 F.3d 770, 774 (6th Cir. 2003). Thus, the threshold question in assessing Koch's claims is whether the Defendants' speech was "commercial and therefore within the jurisdiction of the Lanham Act." *Id.* The Tenth Circuit has held that a plaintiff seeking to invoke the Lanham Act "must show that the alleged infringer used the plaintiff's mark 'in connection with any goods or services.'" *Utah Lighthouse Ministry v. F.A.I.R.*, 527 F.3d 1045, 1050 (10th Cir. 2008). That requirement is "commonly described as the commercial use requirement." *Id.* at 1051-52.

In *Utah Lighthouse Ministry*, an anti-Mormon entity sued a pro-Mormon organization that set up a look-a-like website to parody and criticize the anti-Mormon entity. Because the look-a-like site was not selling goods or services, the Tenth Circuit found it was not commercial in any sense. *Id.* at 1052.

5

The Tenth Circuit emphasized that the scope of the Lanham Act is strictly limited to its function of policing commercial competition for consumers' benefit. "The Lanham Act is intended 'to protect the ability of consumers to distinguish among competing producers,' not to prevent all unauthorized uses." *Id.* (quoting *Two Pesos, Inc. v. Taco Cabana*, 505 U.S. 763, 774 (1992)). The Tenth Circuit, therefore, rejected the argument that it is sufficient for the use to be in connection only with the trademark owner's sale of goods or services:

> In our view, the defendant in a trademark infringement and unfair competition case must use the mark in connection with the goods and services of a competing producer, not merely to make a comment on the trademark owner's goods and services. . . . Unless there is a competing good or service labeled or associated with the plaintiff's trademark, the concerns of the Lanham Act are not invoked.

*Id.* at 1054 (emphasis added).

In this case, Defendants' press release and fake website did not relate to any goods or services and were only political in nature. Not only did the press release and website not relate to Defendants' goods and services, they did not relate to Koch's goods and services. The press release addressed only Koch's views on political issues, it did not address Koch's commercial goods and services. At most, the press release related to how Koch spends its profits and with whom it does business.

Koch asserts that the confusion caused by the fake website is sufficient to establish commercial use under the Lanham Act. To support this theory, Koch relies on three cases in which courts allowed trademark claims to go forward where the defendant's use of the plaintiff's mark might have diverted the public from the plaintiff's website. *See People for the Ethical Treatment of Animals v. Doughney*, 263 F.3d 359 (4th Cir. 2001) ("PETA"); *OBH, Inc. v.*

6

*Spotlight Magazine, Inc.*, 86 F. Supp. 2d 176 (W.D.N.Y. 2000); *Planned Parenthood Fed. of Am., Inc. v. Bucci*, 1997 WL 133313 (S.D.N.Y. 1997).

The Tenth Circuit has rejected this theory, also known as the "interference" theory, and the very three cases on which Koch relies. *See Utah Lighthouse*, 527 F.3d at 1053 & n.6 (criticizing *PETA*, *OBH*, and *Bucci*). "Such an interpretation," the Tenth Circuit reasoned, "eliminates the requirement of an economic competitor and is therefore inconsistent with the purpose of the Lanham Act 'to protect the ability of consumers to distinguish among competing producers.'" *Id.* at 1053 (quoting *Two Pesos, Inc. v. Taco Cabana*, 505 U.S. 763, 774 (1992)). The court also criticized "[t]he 'interference' theory … on the ground that it would 'place most critical, otherwise protected consumer commentary under the restrictions of the Lanham Act.'" *Id.* (quoting *Bosley Med. Inst., Inc. v. Kremer*, 403 F.3d 672, 679 (9th Cir. 2005)). Accordingly, the Tenth Circuit confirmed that "the defendant in a trademark infringement and unfair competition case must use the mark in connection with the goods or services of a competing producer, not merely to make a comment on the trademark owner's goods or services." *Id.* at 1053 (emphasis added).

Koch's interference theory, therefore, is not actionable in the Tenth Circuit. *Utah Lighthouse Ministry* clearly requires some commercial use in connection with the interference or confusion alleged by Koch. Moreover, the court fails to see any allegation that Defendants' conduct interfered with Koch's business activities. Defendants' press release related only to Koch's political views and activities. There was not even any reference to any of Koch's products or business practices. Furthermore, none of the media outlets who received the press release believed it. The only press coverage of Defendants' conduct referred to it as a hoax.

7

Therefore, Defendants have not alleged any facts demonstrating confusion.

Koch next argues that it meets the commercial use requirement by asserting that Defendants issued the press release and set up the website with the intent to draw attention to and funding for Defendants' activities. This theory, however, is not factually plausible. Koch attached fake press release and a printout of the website to its Complaint. Defendants did not identify their group in their press release or on the fake website. Defendants only identified their group during this litigation. Defendants' anonymity is inconsistent with Koch's allegation that they sought attention for fundraising purposes. Moreover, the press release and website provided no means for making a contribution to the anonymous entity. And neither the press release nor the website provided a link to Defendants' real website.

The Lanham Act regulates only economic, not ideological or political, competition. *Utah Lighthouse*, 527 F.3d at 1053. "Competition in the marketplace of ideas" is precisely what the First Amendment is designed to protect. *Anderson v. Celebrezze*, 460 U.S. 780, 794 (1983); *see Snyder v. Phelps*, 562 U.S. ---, slip. op. at 5-6 (March 2, 2011). On its Lanham Act claims, Koch lacks any evidence or plausible theory as to how Defendants could have profited commercially from an anonymous spoof website that sold no products and solicited no donations, that was disclosed only to reporters, and that was only online for a matter of hours. Defendants' speech proposed no commercial transaction. Instead, it sought to draw public attention to Koch's controversial stance on a political issue. Koch's trademark and unfair-competition claims, therefore, fall outside the scope of the Lanham Act and are foreclosed by the act's commercial-use requirement. *See Utah Lighthouse Ministry v. Found. for Apologetic Info. & Research*, 527 F.3d 1045, 1051-54 (10th Cir. 2008); *Cleary Bldg. Corp. v. David A. Dame, Inc.*,

674 F. Supp. 2d 1257, 1267-68 (D. Colo. 2009) (dismissing similar claims for lack of commercial use under *Utah Lighthouse Ministry*). Accordingly, the court grants Defendants' motion to dismiss Koch's Lanham Act claims.

Defendants assert that the court should similarly dismiss the state common law causes of action for trademark infringement and unfair competition. The same First Amendment limitations govern these state-law claims. As this court previously recognized, "Utah law governing unfair competition, infringement of a patent, trademark, or trade name requires 'intentional business acts or practices,' similar to the requirements of the Lanham Act." *Utah Lighthouse Ministry, Inc. v. Discovery Computing, Inc.*, 506 F. Supp. 2d 889, 902 (D. Utah 2007) (quoting U.C.A. § 13-5a-102 (4(a)). Just as Koch cannot satisfy the Lanham Act's "commercial use" requirement, "similarly, Plaintiff's state law claims are deficient in making the same showing." *Id.* Accordingly, the court grants Defendants' motion to dismiss Koch's state claims for trademark infringement and unfair competition.

### 2. Anticybersquatting Consumer Protection Act

Koch's second claim alleges that Defendants violated the Anticybersquatting Consumer Protection Act ("ACPA"), 15 U.S.C. § 1125(d). To establish liability under the ACPA, Koch must show that Defendants "used or registered the domain names with a bad faith intent to profit." *Utah Lighthouse Ministry*, 527 F.3d at 1057. In the absence of such a profit motive—i.e., where the use of a trademark constitutes "bona fide noncommercial or fair use," 15 U.S.C. § 1125(d)(1)(B)(i)(IV)—the ACPA does not apply. *Id.* at 1058 (holding ACPA inapplicable where there was no "inference that the Defendants intended to profit").

Koch argues that it is premature and unreasonable for Koch to be required to introduce

9

evidence of Defendants' intent and motive at the motion to dismiss stage. Koch asserts, however, that by alleging that Defendants used Koch's mark to call attention to and promote Defendants' agenda and to obtain funding for their activities, it is enough to support an ACPA claim at this stage.

Congress designed the ACPA to "target a narrow class of cyber-squatters consisting of those who have the bad faith intent to profit, and not to tread on the rights of those with any other motives." *Mayflower Transit, LLC v. Prince*, 314 F. Supp. 2d 362, 370 (D.N.J. 2004). The statute sets out a list of nine non-exclusive factors that "a court may consider" in determining whether the "bad faith intent to profit" standard is satisfied. 15 U.S.C. § 1125(d)(1)(B)(i). These factors attempt "to balance the property interests of trademark owners with the legitimate interests of Internet users and others" to engage in activities "such as comparative advertising, comment, criticism, parody, news reporting, fair use, etc." *Lamparello*, 420 F.3d at 319 (quoting H.R. Rep. No. 106-412).

The factors provided by the ACPA are "given to courts as a guide, not as a substitute for careful thinking" about the ultimate issue in a cybersquatting claim—"whether the conduct at issue is motivated by a bad faith intent to profit." *Lucas Nursery & Landscaping, Inc. v. Grosse*, 359 F.3d 806, 811 (6th Cir. 2004). Moreover, the factors "should be examined in tandem with the 'safe harbor' in the ACPA which provides that bad faith intent shall 'not be found in any case in which the court determines that the person believed and had reasonable grounds to believe that the use of the domain name was . . . lawful.'" *Mayflower Transit*, 314 F. Supp. 2d at 369 (quoting 15 U.S.C. § 1125(d)(1)(B)(ii)).

The Tenth Circuit addressed the "bad faith intent to profit" requirement of the ACPA in

*Utah Lighthouse Ministry*. While at the district court level this court applied all nine of the ACPA factors to the conduct at issue, on appeal, the Tenth Circuit explained that an examination of all nine factors was not necessary. *Utah Lighthouse Ministry*, 527 F.3d at 1058. The court explained that the "quintessential example of a bad faith intent to profit"—and the activity primarily targeted by the ACPA—is the act of "purchas[ing] a domain name very similar to the trademark and then offer[ing] to sell the name to the trademark owner at an extortionate price." *Id.* In addition, a bad faith intent to profit exists when "[a] defendant intend[s] to profit by diverting customers from the website of the trademark owner to the defendant's own website, where those consumers would purchase the defendant's products or services instead of the trademark owner's." *Id.* The absence of these motives "readily defeat[s] an inference that the Defendants intended to profit" and renders additional application of the ACPA factors unnecessary. *Id.* at 1058.

Koch attempts to distinguish *Utah Lighthouse Ministry* on the grounds that it was decided at the summary judgment stage. But, another district court in the Tenth Circuit has applied *Utah Lighthouse Ministry* at the motion to dismiss stage where there was no plausible allegation that the defendant had an intent to profit. *Cleary Building Corp. v. David A. Dame, Inc.*, 674 F. Supp. 2d 1257, 1267-68 (D. Colo. 2009). The *Clearly Building* court recognized that, at the motion to dismiss stage, "it is not appropriate for this Court to weigh the factors. However, it is appropriate to look at the unique factors in this case to determine whether Plaintiff has pled sufficient facts to state a plausible claim that Defendant had a bad faith intent to profit." *Id.* at 1265. The issue becomes, then, whether Koch has alleged facts stating a plausible cause of action under the ACPA.

11

In this case, Koch does not allege that Defendants registered koch-inc.com with the intent to sell it for profit. Nor does Koch allege that Defendants intended to profit by diverting customers from Koch's own site. The hoax website was not designed to sell anything and neither does Koch's actual website. There was no commercial purpose to the hoax website, only a political purpose. Koch alleges that Defendants profited from the site by using Koch's mark to call attention to and promote their agenda. Given that Defendants set up and operated the website completely anonymously, the only agenda they could have been promoting was the message, not any entity. The website, for the few hours it was up and running, did not solicit funding or provide any method by which donations could be made. Defendants' anonymity would have made donations impossible. Therefore, Defendants' conduct is not the type of harm that the ACPA was designed to protect.

Koch has not alleged facts sufficient for the court to find it plausible that Defendants used Koch's domain name "with a bad faith intent **to profit**." *Id.* at 1263. Koch states that the court cannot make determinations regarding intent or bad faith at the motion to dismiss stage. But, there is no alleged conduct that relates to "profit." Even if the complaint is viewed in the light most favorable to Koch, "it is clear that [defendants were] making a noncommercial use of [p]laintiff's marks." *Id.* at 1265 (dismissing similar cybersquatting claim under *Utah Lighthouse Ministry*).

As discussed above in connection with the Lanham Act claims, Koch's "interference" and "fundraising" theories are not in accordance with Tenth Circuit law. Moreover, Koch's theories are not factually plausible because Defendants' conduct did not relate to Koch's business, only its political viewpoints, and was done completely anonymously. The website here—which had

12

no commercial purpose and was established solely to bring attention to Koch's political stance on climate change— falls "beyond the scope" of the ACPA. *See Lamparello v. Falwell*, 420 F.3d 309, 318 (4th Cir. 2005) (quoting S. Rep. No. 106-140). Accordingly, the court grants Defendants' motion to dismiss Koch's ACPA claim.

### 3. Computer Fraud and Abuse Act and Contract Theories

Koch also alleges that Defendants have violated the Computer Fraud and Abuse Act (CFAA)—a criminal statute that penalizes individuals who "hack" into protected computer systems. Koch relies on 18 U.S.C. § 1030(g), a provision of the CFAA that authorizes civil actions for loss or damage caused by computer hacking. The CFAA imposes criminal and civil liability upon a hacker who accesses a computer system "without authorization or exceeds authorized access," 18 U.S.C. §§ 1030(a)(2), 1030(a)(4).

Koch asserts that in creating the fake website Defendants acted without authorization and inconsistent with the company's grant of access. Even if Defendants had some limited authorization, Koch contends that they acted beyond the authorization granted by breaching its website's Terms of Use. Accordingly, Koch's CFAA theory is related to Koch's breach-of-contract theory, which asserts that Defendants agreed to the Terms of Use by using Koch's website. Defendants argue that both theories lack merit and ask this court to dismiss both causes of action as a matter of law.

To state a plausible claim under 18 U.S.C. § 1030, one must be guilty of gaining "unauthorized access" or "exceeding authorized access" to a protected computer system. But in this case, Defendants created a mockup of Koch's website using information that Koch made "publicly available on the Internet, without requiring any login, password, or other individualized

13

grant of access." *Cvent, Inc. v. Eventbrite, Inc.*, --- F. Supp. 2d ----, 2010 WL 3732183, at *3 (E.D. Va. 2010). "By definition, therefore, [the defendants] could not have 'exceeded' [their] authority to access that data." *Id.*

In *Cvent*, a federal district court recently rejected a similar attempt to stretch the CFAA to the use of publicly available information on a website. There, as here, the plaintiff sought to premise CFAA liability on its website's Terms of Use, which provided: "No competitors or future competitors are permitted to access our site or information." *Id.* But, as with Koch's website, the defendant took "no affirmative steps" to prevent such access. *Id.* The website was "not password-protected, nor [were] users of the website required to manifest assent to the Terms of Use, such as by clicking 'I agree' before gaining access to the database. Rather, anyone … [could] access and search [the] information at will." *Id.* Like Koch's website, the Terms of Use did "not appear in the body of the first page" of the website; instead "[t]he link to access the Terms [was] buried at the bottom of the first page." *Id.* Accordingly, the site was "not protected in any meaningful sense by its Terms of Use or otherwise." *Id.*

The *Cvent* court observed that the plaintiff's claim was really a claim that a user with authorized access had used the information in an unwanted manner, not a claim of unauthorized access or of exceeding authorized access. *Id.* A majority of courts have concluded that such claims lie outside the scope of the CFAA. *See id.; LVRC Holdings LLC v. Brekka*, 581 F.3d 1127 (9th Cir. 2009); *Orbit One Communications, Inc. v. Numerex Corp.*, 692 F. Supp. 2d 373, 383 (S.D.N.Y. 2010); *Lewis-Burke Assocs., LLC v. Widder*, --- F. Supp. 2d ---, 2010 WL 2926161, at *5-6 (D.D.C. 2010).

Similarly, in this case, Defendants were given unimpeded access to the information on

Koch's public website. Koch's complaint is not that Defendants obtained the information without authorization, but rather that they ultimately used the information in an unwanted manner. The CFAA addresses only the act of trespassing or breaking into a protected computer system; it does not purport to regulate the various uses to which information may be put.

Koch also attempts to argue that it has alleged loss under the CFAA, but loss under the CFAA "has consistently meant a cost of investigating or remedying damage to a computer or a cost incurred because the computer's service was interrupted." *Nexan Wires, S.A. v. Sark-USA, Inc.*, 319 F. Supp. 2d 468, 475 (S.D.N.Y. 2004), *aff'd*, 166 Fed. Appx. 559 (2d Cir. 2006); *accord Commc'ns Westwood Corp. v. Robincharux*, 2007 WL 756528 (E.D. La. 2007). It is insufficient to "claim[] to have lost money . . . because of the way the information was later used." *Nexan*, 319 F. Supp. 2d at 477. "The CFAA does not contemplate consequential damages … unrelated to harm to the computer itself." *Am. Ins. Family Mut. Ins. Co. v. Rickman,* 554 F. Supp. 2d 766, 772 (N.D. Ohio 2008).

In addition, "[a]lthough this case arises in a civil context," the court's conclusion as to the extent of conduct prohibited by the CFAA "is equally applicable in the criminal context" and must be interpreted consistent with the "rule of lenity," avoiding "surprising and novel" interpretations that "impose unexpected burdens on defendants." *LVRC Holdings LLC*, 581 F.3d 1127, 1134-35 (9th Cir. 2009) (applying the rule in a civil CFAA case). If Koch's legal theory is correct, then any violation of its Terms of Use—that is, any use of its website's content of which Koch does not approve—could expose a political critic to criminal prosecution. Such a result is clearly beyond Congress' intent in passing the CFAA.

Even assuming that liability under the CFAA could be premised on a contractual theory

15

related to the Koch website's Terms of Use, Koch's CFAA and breach-of-contract claims both fail under traditional contract principles. There can be no contract absent "a manifestation of assent to an offer, such that an objective, reasonable person is justified in understanding that a fully enforceable contract has been made." *Cal Wadsworth Const. v. City of St. George*, 898 P.2d 1372, 1376 (Utah 1995); *see* Restatement (Second) of Contracts § 19(2) (1981). That requirement is no less applicable on the Internet. "Reasonably conspicuous notice of the existence of contract terms and unambiguous manifestation of assent to those terms by consumers are essential if electronic bargaining is to have integrity and credibility." *Specht v. Netscape Communications Corp.*, 306 F.3d 17, 35 (2nd Cir. 2002).

The Terms of Use on Koch's website were available only through a hyperlink at the bottom of the page, and there was no prominent notice that a user would be bound by those terms. Koch's Complaint neither alleges nor produces evidence of any manifestation of assent to those terms. The website does not provide any method for manifesting such assent. Seeking to avoid *Specht*, Koch points to unpublished district court cases that enforced online agreements in the context of commercial transactions—in which goods or services were exchanged over the Internet. These are significantly different than the present case. Koch does not identify a single case imposing "contractual" speech restrictions on noncommercial web users.

The court, therefore, concludes that Koch has not alleged a plausible claim that Defendants engaged in unauthorized access of a protected computer system, manifested assent to the Terms of Use on Koch's website, or even that the website provided any method by which consent could be manifested. Koch's failure to articulate any plausible theory on these points demonstrates that its CFAA and breach of contract claims cannot survive a motion to dismiss.

Accordingly, the court grants Defendants' motion to dismiss Koch's CFAA and breach of contract causes of action.

**B. Motion to Quash Subpoena and Motion for Protective Order**

Before authorizing subpoenas seeking to strip speakers of their First Amendment right to anonymity, courts require plaintiffs to make a preliminary showing that their complaint has merit. *Dendrite v. Doe*, 775 A.2d 756 (N.J. Super Ct App. Div. 2001); *Doe v. Cahill*, 884 A.2d 451, 461 (Del. 2005). A growing number of courts have recognized that civil subpoenas seeking information regarding anonymous speakers raise First Amendment concerns. *See SaleHoo Group, Ltd. v. ABC Co.*, 722 F. Supp. 2d 1210, 1214-15 (W.D. Wash. 2010). "If Internet users could be stripped of [their] anonymity by a civil subpoena enforced under the liberal rules of civil discovery, this would have a significant chilling effect on Internet communications and thus on basic First Amendment rights." *Doe v. 2the Mart.com*, 140 F. Supp. 2d 1088, 1093 (W.D. Wash. 2001).

Accordingly, courts have "outlined strict rules for allowing a subpoena that has the effect of unmasking the identity of anonymous online speakers." *Doe v. Shurtleff*, 2008 WL 4427594, at *6 (D. Utah 2008). Such rules serve the important purpose of "assess[ing] the viability of [a plaintiff's] claims before casting aside [the speaker's] anonymity, which once lost cannot be recovered." *SaleHoo Group,* 722 F. Supp. 2d at 1215. Although courts have adopted slightly different versions of the test, "[t]he case law . . . has begun to coalesce around the basic framework of the test articulated in *Dendrite*." *Id.* at 1214 (citing *Dendrite*, 775 A.2d 756 (N.J. Super. Ct. App. Div. 2001)). The *Dendrite* court held that "[i]n addition to establishing that its action can withstand a motion to dismiss …, the plaintiff must produce sufficient evidence

supporting each element of its cause of action, on a prima facie basis, prior to a court ordering the disclosure of the identity of the unnamed defendant." 775 A.2d at 760.

Because the court has granted Defendants' motion to dismiss and determined that Koch's Complaint does not state any claims upon which relief may be granted, the court quashes the subpoenas this court previously allowed to be served and grants Defendants' request for a protective order preventing the disclosure of any individual's identity that may have been disclosed through the third parties' compliance with the subpoenas.

## CONCLUSION

For the reasons stated above, Defendants' Motion to Quash Subpoenas, Issue Protective Order, and Dismiss Complaint is GRANTED.

DATED this 9th day of May, 2011.

BY THE COURT:

_____
DALE A. KIMBALL
United States District Judge